**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| TERRANCE STANBACK, | Criminal Action No. TDC-14-0554 |
| Defendant. | |

**MEMORANDUM OPINION**

On December 1, 2014, a grand jury returned an indictment against Defendant Terrance Stanback, as well as co-defendant Olden Minnick, in which Stanback was charged with conspiracy to distribute or possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, and with possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841.[1] These charges derive in part from a warrantless search of Stanback's person and car by the Prince George's County Police Department ("PGPD") and a subsequent search pursuant to a warrant of Stanback's home. On May 26, 2015, Stanback filed a Motion to Suppress Physical Evidence in which he sought to suppress all physical evidence seized during the search of his person, car, and home. After the Government responded to the Motion on August 11, 2015, the Court held an evidentiary hearing on September 10, 2015, at the end of which the Court ordered supplemental briefing. On October 19, 2015, the Government filed its Supplemental Response to the Motion to Suppress. Two days later, Stanback filed a Memorandum of Points and Authorities in Support of Defendant's Motion to Suppress Physical

---

[1] Although the indictment lists 21 U.S.C. § 846 as the basis for both charges, that citation appears to be a drafting error with respect to the possession with intent to distribute heroin charge. On December 14, 2015, the grand jury returned a Superseding Indictment correcting this error and adding additional counts.

Evidence ("Def.'s Mem. Suppress"). On October 28, 2015, the Government filed an Opposition to Stanback's Supplemental Motions to Suppress. Upon consideration of the briefs, the evidence presented at the hearing, and the oral argument of counsel, the Motion to Suppress is DENIED.

## BACKGROUND

At the evidentiary hearing, the Court heard testimony from PGPD Officer Kevin Stevenson, PGPD Officer Joseph Kehoe, United States Drug Enforcement Administration Special Agent David Buckel, and Defendant Stanback. Based on this testimony, and several exhibits introduced at the hearing, the Court makes the following findings of fact.

**I.  Findings of Fact**

On September 4, 2014, Officer Stevenson was on patrol in a marked police cruiser when PGPD Detective Jernigan, known by Officer Stevenson to conduct narcotics investigations, asked him to follow Stanback's car and make a traffic stop if he determined that the driver violated any traffic laws. Detective Jernigan also radioed Officer Kehoe, a canine unit officer, and asked him to drive to Clinton, Maryland to assist with this possible traffic stop.

Officer Stevenson located the vehicle, a Ford SUV, on Piscataway Road in Clinton, Maryland and began to follow it. From approximately five cars behind, Officer Stevenson observed Stanback drive past a school bus that was stopped on the opposite side of the road with flashing lights and its stop sign "fully out." Mots. Hearing Tr., at 8–9, Sept. 10, 2015, ECF No. 118 ("Tr."). When Stanback passed by the school bus without stopping, Officer Stevenson observed the school bus driver throw her hands up in the air, apparently in exasperation. Special Agent Buckel, who was in an unmarked vehicle two or three cars behind Stanback, also saw Stanback go through the school bus's stop sign without stopping.

After waiting for the school bus to retract its stop sign, Officer Stevenson caught up with Stanback's vehicle and activated his police lights. After Stanback pulled over to the side of Piscataway Road, Officer Stevenson radioed that he had conducted a stop. Officer Stevenson approached Stanback's car, informed him that he had been pulled over for going through a school bus stop sign, and asked for his license and registration. Officer Stevenson then went back to his cruiser to write the ticket. From his cruiser, which was directly behind Stanback's car, Officer Stevenson could see clearly inside of the vehicle through a large back window, including Stanback's chest and head. While writing the ticket, Officer Stevenson noticed that Stanback was "moving around a lot, underneath the seat and towards the back of the seat," leaning forward "as if he was going underneath the seat," and "moving to the passenger side of the vehicle and to the rear row of seats directly behind him." *Id.* at 12, 38, 46. Fearing that Stanback might be reaching for a weapon, Officer Stevenson stopped writing the ticket, approached the SUV again, and "asked him if he had any weapons or anything on him" and if he would step out of the vehicle. *Id.* at 12–13.

Officer Stevenson then attempted to secure Stanback's consent to search him for weapons. At the hearing, however, Officer Stevenson could not recall what he specifically said to Stanback and gave varying accounts. At one point, he testified, "I asked him if could place his hands behind his head while I conducted a frisk of his outer garments for weapons." *Id.* at 13. At another point, he acknowledged not remembering his specific words, but testified that "[u]sually, what I ask is step out of the vehicle and, you know, I'm going to search your person." *Id.* at 42. At yet another point, when asked whether Stanback said "yes, you can search me," Officer Stevenson acknowledged that Stanback never said yes, but noted that he "never said no." *Id.* at 35. Later, he stated that he could not recall "how it was worded" but that he was "pretty

3

sure" Stanback said "yes, you can search me," *id.* at 41–42, and that Stanback consented to the search "in general," *id.* at 46.

Whatever Officer Stevenson said, after he said it, Stanback responded by stepping out of the vehicle and placing his hands behind his head. At that point, with Stanback's arms raised up, Officer Stevenson could see Stanback's pants pockets and noticed a clear, plastic bag hanging out of his pocket. Officer Stevenson took hold of the plastic bag and asked Stanback what it was. Stanback responded by pulling his hands down and slapping Officer Stevenson's hand away, causing the bag to fall out of the pocket onto the ground. Officer Stevenson could then see that it was "a small glassine bag and a cut straw." *Id.* at 14. Based on his training and experience, Officer Stevenson recognized the brown substance inside to be heroin and the cut straw to be a device often used to snort heroin.

Officer Stevenson then placed Stanback in handcuffs and moved him to the front seat of his cruiser. At that point, Officer Kehoe, the canine officer, arrived on the scene. Officer Kehoe then directed his police dog to sniff around Stanback's vehicle. The dog immediately alerted, entered the driver's side window, and put his nose by the seam in the front driver's seat. Officer Kehoe told Officer Stevenson that this meant that "there's going to be more in his pants area, in his crotch area." *Id.* at 87. Officer Stevenson then took Stanback out of the car, placed him between the open front and rear doors of the car to protect his privacy, opened his pants, and found a larger bag of narcotics, which proved to be heroin.

On November 26, 2014, law enforcement officials secured a search warrant for Stanback's residence based in part on the recovery of heroin from Stanback during the traffic stop.

4

## II.   Stanback's Account

Stanback's testimony regarding these events differed from the above-described facts in several key respects. First, he asserted that the school bus he saw was stopped in the middle of the road, was waiting to make a left turn, and did not have its flashing lights on or its stop sign extended. Second, he testified that after receiving Stanback's license and registration, Officer Stevenson waited in his police cruiser approximately 45 to 50 minutes. After that time had elapsed, Officer Kehoe allegedly arrived and the two officers approached the car. Stanback testified that Officer Stevenson then took Stanback's keys, told him to step out of the car, and told Stanback that he had a right to search the vehicle for weapons because of a protective order against Stanback. He then ordered Stanback to put his hands behind his head and started to search his pockets, where he found the plastic bag with heroin. When Stanback protested, Officer Kehoe, who was standing behind him, grabbed him and told him to calm down.

The Court does not credit this account because Officer Stevenson's testimony regarding the school bus was corroborated by Special Agent Buckel, and Stanback's conflicting account of the recovery of the plastic bag was contradicted by Officer Kehoe, who unequivocally testified that he was not on scene until after Stanback had been handcuffed by Officer Stevenson. Moreover, Stanback acknowledged that he had sniffed heroin less than three hours before the incident, raising questions about the accuracy of his perception of events that day.

## DISCUSSION

In seeking suppression of the evidence, Stanback argues that the PGPD had no legal basis to stop his car, that there was no legal basis to search Stanback's person, and that the search warrant for Stanback's home was thus "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963). The Government asserts that (1) the stop was justified because Stanback committed a traffic violation; (2) the search was justified because Stanback consented

to it; and (3) in the alternative, the initial search was justified as an investigatory frisk under *Terry v. Ohio*, 392 U.S. 1 (1968).

**I.    Traffic Stop**

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" regardless of "the actual motivations of the individual officers involved." *See Whren v. United States*, 517 U.S. 806, 810–13 (1996). Here, Officer Stevenson observed Stanback illegally drive through the flashing red lights and stop sign of a stopped school bus on the opposite side of the road. "If a school vehicle has stopped on a roadway and is operating the alternately flashing red lights specified in § 22-228 of this article, the driver of any other vehicle meeting or overtaking the school vehicle shall stop . . . at least 20 feet from the front of the school vehicle, if approaching from its front." Md. Code Ann., Transp. § 21-706(a) (West 2010). Although Stanback testified that the school bus was not stopped with flashing lights, but instead was at an intersection preparing to make a left turn, the Court credits the testimony of Officer Stevenson, particularly because it was corroborated by Special Agent Buckel and both law enforcement officers conveyed specific details about the incident, such as the bus driver's reaction to Stanback's failure to stop. Having directly observed Stanback commit a traffic violation, Officer Stevenson thus had a lawful basis under the Fourth Amendment to pull over Stanback's vehicle. *See Whren*, 517 U.S. at 810.

Stanback further argues that the seizure was unreasonable because "it exceeded the time required to write a traffic ticket for passing a school bus." Def.'s Mem. Mot. Suppress ¶ 9(a). The Supreme Court has held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614

6

(2015) (internal citations and quotation marks omitted). Because addressing the infraction is the purpose of the stop, a traffic stop "may last no longer than is necessary to effectuate ˙th[at] purpose." *Id.* (quotation marks and citations omitted). In *Rodriguez*, the Court found that the police cannot extend an otherwise-completed traffic stop in order to wait for a police dog to be brought to the scene to sniff for drugs. *Id.* at 1616.

Here, Stanback claims that once Officer Stevenson pulled him over and obtained his license and registration, Officer Stevenson sat in his police cruiser for "45 to 50 minutes" before returning to Stanback's car. Tr. at 56. This testimony, however, was contradicted by that of Officer Kehoe, who testified that even before the stop occurred, he was directed to drive toward Clinton, Maryland in anticipation of a traffic stop, that he heard about the stop over the radio en route, and that it only took him 5 to 10 minutes to reach the scene. Given that Stanback acknowledged that he had snorted heroin less than three hours before the traffic stop, and when asked if he was sure about the 45 to 50 minute time frame, Stanback backtracked and said, "That's what it felt like," *id.* at 79, the Court resolves this discrepancy in favor of Officer Kehoe's account. By the time Officer Kehoe arrived on the scene, Officer Stevenson had already discovered the glassine bag of drugs that had been in Stanback's pocket and handcuffed Stanback, so there was no undue delay to wait for a dog sniff. Accordingly, the Court finds no basis to conclude that the traffic stop was unreasonably prolonged.

## II.   Search

Warrantless searches are *per se* unreasonable unless they fall within one of the "well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). Two such exceptions, asserted by the Government and discussed below, are a consent search and a *Terry* frisk for weapons when an officer reasonably concludes that "criminal

7

activity may be afoot" and that the suspect "may be armed and presently dangerous." *Terry*, 392 U.S. at 30.

### A.    Consent Search

The Government first argues that Officer Stevenson's search of Stanback was justified under the consent search exception to the warrant requirement of the Fourth Amendment. It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government has the burden to prove "that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Wilson*, 895 F.2d 168, 171 (4th Cir. 1990). "In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). "Relevant factors include the officer's conduct, the number of officers present, the time of the encounter, and characteristics of the individual who was searched, such as age and education. Whether the individual searched was informed of his right to decline the search is a highly relevant factor." *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (internal citations and quotation marks omitted).

Here, the Government has not met its burden of proving that Stanback consented to a search. Stanback testified that he never consented to a search. Although Officer Stevenson testified that he asked for and obtained consent from Stanback, and may well have believed in his own mind that he had obtained consent, he was unable to describe with any precision how he framed his request for consent, or how Stanback communicated that consent. Indeed, it is entirely unclear what Officer Stevenson said to Stanback. He offered two possible versions of

8

what he said, neither of which clearly constituted a request for consent. First, he testified that "I asked him if could place his hands behind his head while I conducted a frisk of his outer garments for weapons." Tr. at 13. Although arguably a request for consent to search, this statement could also be construed as informing Stanback that Officer Stevenson was going to conduct a pat frisk, with or without consent, and that he was requesting that Stanback facilitate this search by raising his hands. Later, after acknowledging that he did not recall his specific words, Officer Stevenson offered that "[u]sually what I ask is step out of the vehicle and, you know, I'm going to search your person." *Id.* at 42. That phrasing, particularly the statement "I'm going to search your person," is effectively a command, rather than a request for consent to search. Thus, it is unclear whether Officer Stevenson ever said anything to Stanback that would reasonably have been understood to be a request for consent to search.

Even if Officer Stevenson made a clear request for consent, the Government has not established that Stanback gave his consent. When asked whether Stanback said "yes, you can search me," Officer Stevenson acknowledged that Stanback never said yes, but noted that he "never said no." *Id.* at 35. Later, he stated that he could not recall "how it was worded" but that he was "pretty sure" Stanback said "yes, you can search me," *id.* at 41–42, and that Stanback consented to the search "in general." *Id.* at 46. These varying answers show that Officer Stevenson did not have a clear memory of what statement, if any, he construed as providing consent. The Government therefore has not met its burden to show that Stanback expressly consented to a search of his person.

Even when there is no express consent, however, consent "may be inferred from actions as well as words." *See United States v. Hylton,* 349 F.3d 781, 786 (4th Cir. 2003). Stanback's action of raising his hands prior to the search arguably could constitute implied consent to

9

search. *See, e.g., United States v. Wilson*, 895 F.2d 168, 170–72 (4th Cir. 1990) (noting that where a law enforcement officer asked the defendant if he could search his person, the defendant's act of shrugging his shoulders and extending his arms constituted consent). At the same time, there is a "difference between voluntary consent to a request versus begrudging submission to a command." *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013); *see also Bumper*, 391 U.S. at 548–49 (holding that the burden of proving voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"). Because the Government has not satisfactorily established that Officer Stevenson asked Stanback for consent to search him, the Government cannot demonstrate that Stanback's raising of his arms constituted consent rather than submission to a stated intention to search. This conclusion is further bolstered by the fact that Officer Stevenson never told Stanback that he could decline the search, which, although not dispositive, is "highly relevant." *See Wilson*, 895 F.2d at 172. Thus, under the totality of the circumstances, the Government has not established consent.

### B. *Terry* Frisk

The Government next argues that Officer Stevenson's search of Stanback was justified as a protective frisk under *Terry*. Under the Fourth Amendment, once a police officer has made a lawful investigatory stop, if the officer observes unusual conduct which leads him reasonably to conclude in light of his experience that the person stopped "may be armed and presently dangerous" he may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30.

Because Officer Stevenson lawfully stopped Stanback for a traffic violation, he necessarily could order Stanback to step out of the vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). The question is whether he also had a reasonable basis to conduct a *Terry*

frisk. At the time that Officer Stevenson initiated his search, he knew that in addition to having committed a traffic violation, Stanback was a suspect in an ongoing narcotics investigation conducted by Detective Jernigan. *See United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) (stating that under the collective-knowledge doctrine, the knowledge of an instructing officer can be imputed to the acting officer). He also observed, while writing the ticket, that Stanback was "moving around a lot," that he was leaning forward "as if he was going underneath the seat," and "moving to the passenger side of the vehicle and to the rear row of seats directly behind him." Tr. at 12, 38, 46. Significantly, during his testimony, Stanback never denied that he had moved around inside his car in this manner. It was these movements that caused Officer Stevenson to be concerned that Stanback was reaching for a weapon and to interrupt his processing of the traffic stop to return to Stanback's vehicle.

The Fourth Circuit has upheld pat frisks under similar circumstances. In *United States v. Spearman*, 254 F. App'x 178 (4th Cir. 2007), the court held that during a stop of a vehicle from which drugs had reportedly been sold, an officer could conduct a pat frisk after the driver, who appeared to be a particular drug dealer known to carry weapons, looked at the officer through the rear-view mirror, "duck[ed] his left shoulder, apparently reaching under his driver's seat," then provided an unlikely excuse for his movements. *Id.* at 181–82. The Fourth Circuit has also upheld a pat frisk where a driver was suspected of drug activity due to an odor of marijuana, appeared evasive and alarmed, and was seen "reaching beneath the truck's passenger seat after the truck was stopped." *United States v. Fridie*, 442 F. App'x 839, 841 (4th Cir. 2011). Although a close call, the combination of the general knowledge that Stanback was a drug suspect and the furtive movements upon the police stop justified Officer Stevenson's decision to conduct a pat frisk for officer safety. *See Terry*, 392 U.S. at 30; *Spearman*, 254 F. App'x at 181;

11

*Fridie*, 442 F. App'x at 841; *cf. United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998) (holding that where there is "a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others" because "guns often accompany drugs").

The case law cited by Stanback does not alter this conclusion. In *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), the Fourth Circuit found that a *Terry* frisk of a man standing on a street several blocks from the reported location of shots being fired violated the Fourth Amendment when it was based on the fact that the defendant looked nervous, stood apart from his companions, did not make eye contact, and refused to consent to a search. *Id.* at 484. There was no evidence of movements consistent with reaching for a concealed weapon. *See id.* The other cited cases involved the issue of whether certain movements and additional facts supported the initiation or continuation of an investigative stop, not whether movements during a valid *Terry* stop could justify a pat frisk for officer safety. *See United States v. DiGiovanni*, 650 F.3d 498, 513 (4th Cir. 2011) (invalidating prolonging of traffic stop to investigate possible drug activity and to request consent to search based in part on the observation that the driver's hands were "trembling" when he handed over his driver's license); *United States v. Foster*, 634 F.3d 243, 245, 248 (4th Cir. 2011) (invalidating *Terry* stop on occupants of a parked car based in part on observation that the defendant's arms were "shifting" and "going haywire"). Thus, under the totality of the circumstances, Officer Stevenson had a reasonable basis to conduct a protective pat frisk of Stanback to ensure his safety.

Officer Stevenson was therefore permitted to conduct a pat frisk of Stanback for weapons, including directing Stanback to put his hands behind his head and then handling the

12

"outer surface" of Stanback's garments. *Terry*, 392 U.S. at 30. He could only search a hidden object if its "contour or mass makes its identity immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Officer Stevenson was just beginning this pat frisk when he observed, upon Stanback putting his hands behind his head as requested, a plastic bag protruding from Stanback's pocket. He then took hold of the plastic bag and, without removing it, asked Stanback what it was. Stanback then reached down and slapped Officer Stevenson's hand away, causing the bag to fall out of the pocket onto the ground, where Officer Stevenson could recognize the contents as heroin.

The Government does not contend that the identity of the plastic bag as drugs was "immediately apparent" when it was first observed, or that Officer Stevenson believed it contained a weapon, so Officer Stevenson would not have been permitted, pursuant to a *Terry* frisk, to pull the bag out and search it. But because the bag's removal was caused by Stanback's slap of Officer Stevenson's hand, rather than by Officer Stevenson pulling it out, the officer did not exceed the permissible scope of a pat frisk. Based on the discovery of heroin, Officer Stevenson then had probable cause to arrest Stanback and place him in the police cruiser, which in turn justified the dog sniff of Stanback's vehicle and the more intrusive search of Stanback to discover the additional heroin. Therefore, all of the heroin discovered on Stanback's person was lawfully seized, and the search warrant that derived in part from those events was valid.

## CONCLUSION

For the foregoing reasons, Stanback's Motion to Suppress, ECF Nos. 76 & 113, is

DENIED.  A separate Order shall issue.

Date: December 23, 2015

THEODORE D. CHUANG
United States District Judge